

☒ District Court ☐ Denver Probate Court
County of Jefferson, Colorado
Court Address:
Jefferson County District Court
100 Jefferson County Parkway
Golden, CO 80401-6002

IN THE MATTER OF ☒ THE ESTATE OF:

MAUREEN K. SCOTT

☒ Deceased ☐ Protected Person ☐ Minor ☐ Ward

**LETTERS**

COURT USE ONLY

Case Number: 07 PR 0423
Division: _____ Courtroom: _____

(Name) Minor M. Scott III was appointed or qualified by this Court or its Registrar on (date) _____ as of _____

☒ Personal Representative. The decedent died on the date of 3/23/07.
  ☐ These are *Letters of Administration*. (The decedent did not leave a will.)
  ☒ These are *Letters Testamentary*. (The decedent left a will.)

☐ Special Administrator in ☐ an informal ☐ a formal proceeding. These are *Letters of Special Administration*.

☐ Conservator. These are *Letters of Conservatorship*.
  ☐ The protected person is a minor whose date of birth is _____
  ☐ Special Conservator.

☐ Guardian. These are *Letters of Guardianship* for
  ☐ an incapacitated person. ☐ a minor whose date of birth is _____
  ☐ Emergency Guardian. (Expires on _____
  after appointment, Section 15-14-312, C.R.S.)

Appointment or qualification is by ☐ court order. ☐ will. ☐ written instrument.

These *Letters* evidence full authority, except for the following limitations or restrictions, if any:
_____ not more than 60 days

Date: APR 19 2007

_____
Clerk/Registrar

**CERTIFICATION**

Certification Stamp   or   Certified to be a true copy of the original in my custody and to be in full force and effect as of

Date APR 19 2007

_____
Clerk

1439961_1.doc  This form conforms in substance to the current version of the approved form.
No. CPC17, Rev. 1-03. LETTERS (Page 1 of 1)



MILRUTH CORP.
STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT ("Agreement") is made this

5 day of _February_, 1996, among Milton S. Kiver, Ruth A.

Kiver, Maureen S. Scott, Dianne K. Shah, and Michael Blum, M.D.,

hereinafter sometimes referred to collectively as the

"shareholders" and each singly as a "shareholder", and MILRUTH

CORP., a corporation organized and existing under the laws of the

State of Illinois, hereinafter referred to as the "Corporation".

RECITALS

A.     The Corporation has presently authorized ten thousand

(10,000) shares of common stock, no par value, of which one

thousand (1,000) shares are presently issued and outstanding, all

or any portion of such issued and outstanding shares are

hereinafter referred to as "Shares".

B.     The shareholders presently own all of the Shares, their

respective interests being as follows:

| Name of Shareholder | No. Of Shares |
|---|---|
| Milton S. Kiver | 245    ~ DoD 7-31-056 |
| Ruth A. Kiver | 245 |
| Maureen S. Scott | 245 - DoD 3-23-07 |
| Dianne K. Shah | 245 |
| Michael Blum, M.D. | 20 |

C.     The Corporation and the shareholders realize that in the

event of the death of a shareholder or of the sale of his or her

Shares during his lifetime, if the Shares owned by such shareholder

should pass into the ownership or control of a person other than

SCOTT v. C&T 552

the present shareholders the harmonious and successful management and control of the Corporation would tend to be disrupted.

D.   The Corporation and the shareholders desire to avoid the happening of any such unfortunate contingency by assuring to the present shareholders continuity of ownership and control of the Corporation through its acquisition of the Shares of a shareholder at the time of his or her death or upon his transfer of Shares during his lifetime.

## CLAUSES

In consideration of the mutual covenants and agreements set forth below, the Corporation, for itself and its successors, and the shareholders, for themselves, their respective heirs, executors, administrators and assigns, agree as follows:

## ARTICLE I

### PURCHASE UPON DEATH

1.1   <u>Option of Remaining Shareholders</u>.   For sixty (60) days following the death of a shareholder, the remaining shareholders shall have an option to purchase from the estate of the deceased shareholder all or any portion of the Shares which were owned by the deceased shareholder at the date of his or her death.

1.2   <u>Obligation of Corporation to Purchase all Shares Not Purchased by Remaining Shareholders</u>.   If the remaining shareholders fail to exercise their option to purchase the Shares of a deceased shareholder in accordance with Section 1.1 above, or they exercise their option with respect to less than all of the Shares of the

SCOTT v. C&T 553

deceased shareholder, the Corporation shall purchase all of the Shares of the deceased shareholder with respect to which the remaining shareholders have not exercised their said option.

ARTICLE II

OPTIONS UPON VOLUNTARY TRANSFER

2.1   Notice of Intended Transfer.   If a shareholder intends to transfer Shares which he or she owns to any person other than the Corporation, he or she shall give prior written notice simultaneously to the Corporation and each of the remaining shareholders of his or her intention to transfer. The notice, in addition to stating the fact of the intention to transfer Shares, shall state (i) the number of Shares to be transferred, (ii) the name, business and residence address of the proposed transferee, and (iii) whether or not the transfer is for a valuable consideration, and, if so, the amount of the consideration and the other terms of the sale.

2.2   Options.   For sixty (60) days following the giving of the notice of the proposed transfer to the Corporation and the remaining shareholders, the Corporation shall have an option to purchase all or any portion of the Shares proposed to be transferred for the price and upon the terms hereinafter provided. If the Corporation does not exercise its option to purchase all or any portion of such Shares within the said sixty (60) day period, the remaining shareholders, for seventy (70) days following the giving of the said notice, shall have an option to purchase all of

3

SCOTT v. C&T 554

the non-purchased Shares. The Corporation and the remaining shareholders must in the aggregate exercise their options to purchase all of the Shares proposed to be transferred or forfeit their options.

2.3     <u>Death of Selling Shareholder.</u>    If a shareholder who proposes to transfer Shares dies subsequent to the giving of notice as provided herein and prior to the closing of the sale and purchase contemplated by this Article II, any such proposed transfer shall become null and void and his or her Shares shall be the subject of sale and purchase under Article I hereof relating to a purchase upon death.

2.4     <u>Non-Exercise of Options.</u>    If the foregoing purchase options are forfeited or not exercised in compliance herewith, the Shares may, within fifteen (15) days following the expiration of the option period for the remaining shareholders, be transferred to the transferee named in the aforesaid notice of intention to transfer Shares, and upon the terms therein stated, free of the terms of this Agreement. If the transfer is not upon the terms or is not to the transferee stated in the notice, or is not within the said fifteen (15) day period, or if the transferor, after the transfer, reacquires all or any portion of the transferred Shares, the Shares so transferred shall remain subject to this Agreement as if no transfer had been made.

4

SCOTT v. C&T 555

## ARTICLE III

### OPTIONS UPON INVOLUNTARY TRANSFER

If other than by reason of a shareholder's death, Shares are transferred by operation of law to any person other than the Corporation (such as but not limited to a shareholder's trustee in bankruptcy, to a purchaser at any creditor's or court sale or to the guardian or conservator of an incompetent shareholder), the Corporation, for sixty (60) days following the Corporation's receipt of actual notice of the transfer, or the remaining shareholders for seventy (70) days following such receipt of notice, shall have an option to purchase all, but not less than all, of the Shares so transferred upon the price and terms as hereafter provided.

## ARTICLE IV

### EXERCISE OF OPTIONS

4.1  <u>More than One Remaining Shareholder.</u>  Notwithstanding anything contained in this Agreement to the contrary, if the remaining shareholders have an option to purchase the Shares of a shareholder and there is more than one remaining shareholder, the option period specified in the provision of this Agreement which grants the option, such option period being hereinafter referred to as the "Original Option Period," shall be extended for ten (10) additional days, such ten (10) day period being hereinafter referred to as the "Extension Period"; and such option shall be subject to the provisions hereinafter set forth.

5

(a)     During the Original Option Period, each remaining shareholder shall have an option to purchase such number of the Shares which are subject to the option, such Shares being hereinafter referred to as "Option Shares," which bears the same proportion to the total number of Option Shares as the number of Shares owned by each such remaining shareholder at the beginning of the Original Option Period bears to the total number of Shares then owned by all the remaining shareholders.

(b)     If any remaining shareholder fails to exercise his or her option to purchase such Option Shares, each remaining shareholder who had and exercised such option to purchase Option Shares shall, during the Extension Period, have an option to purchase the Option Shares with respect to which the remaining shareholder has failed to exercise his or her option.  In the case of a single remaining shareholder, his option shall be to purchase all of the non-purchased Option Shares.  In the case of two or more remaining shareholders, each such remaining shareholder's option shall be to purchase the number of such non-purchased Option Shares which bears the same proportion to the total number of non-purchased Option Shares as the number of Shares owned by each such remaining shareholder at the beginning of the Original Option Period bears to the total number of Shares then

6

## ARTICLE V

## PURCHASE PRICE

5.1 **Amount.** The purchase price of Shares to be purchased hereunder shall be their agreed value existing on the Valuation Date.

5.2 **Valuation Date.** The Valuation Date, as used herein, shall be

(a) in the case of a purchase resulting from the death of a shareholder, the date of death of the shareholder;

(b) in the case of a purchase resulting from an option upon voluntary transfer, the date on which the required notice of intention to transfer Shares was given to the Corporation and the remaining shareholders;

(c) in the case of a purchase resulting from an option upon involuntary transfer, the date on which the Corporation received actual notice of a transfer of Shares;

5.3 **Determination of Agreed Value.** The Corporation and each of the shareholders mutually agree that unless and until a new agreed value is established in the manner herein provided, the Agreed Value of each one of the Shares to be purchased shall be the Book Value per Share as determined pursuant to Section 5.4. Such Agreed Value is and shall at all times be inclusive of the value of any goodwill of the Corporation. The Agreed Value of each such

8

Share may be redetermined from time to time by the parties. Any such redetermination of the Agreed Value by the parties shall be effective upon their filing with the Secretary of the Corporation a Certificate of Agreed Value in substantially the same form as that set forth in Exhibit "C" hereof, dated and signed by each of the parties. The Secretary shall insert each such Certificate of Agreed Value in the minute book of the Corporation, immediately following the minutes of the meeting of Directors at which the redetermination of the Agreed Value was made. Except as hereinafter provided in this Article V, the Certificate of Agreed Value last filed with the Secretary of the Corporation in accordance with the foregoing shall be conclusive as to the purchase price and shall be accepted by and binding upon all parties hereto. The initial determination herein of the purchase price of the Shares shall be treated as the initial Certificate of Agreed Value for all purposes hereunder.

   5.4   Book Value Per Share.   Book Value per Share shall be determined by dividing the Book Value of the Corporation on each such date by the number of issued and outstanding common shares of the Corporation as of each such date. The term "Book Value of the Corporation," as used herein, shall be an amount equal to the amount of the Corporation's assets, less the amount of its liabilities, on the applicable date as reflected by balance sheets which have been or shall be prepared by the accountant regularly retained by the Corporation in accordance with generally accepted

9

SCOTT v. C&T 559

accounting principles consistently applied, except that adjustments shall be made as follows:

(a)  Insurance, if any, owned by the Corporation on the life of any shareholder shall be considered to be an asset of the Corporation valued at its cash surrender value on the applicable date. Any such insurance owned on the life of a deceased shareholder whose Shares are being purchased hereunder shall be valued as aforesaid and not at its face value.

(b)  No adjustment shall be made on account of any event occurring subsequent to the Valuation Date, whether the event constitutes an adjustment to the federal or state income tax liability of the Corporation or otherwise.

(c)  The reserve for depreciation with respect to depreciable assets shall be reduced by the amount, if any, by which the amount of the reserve for depreciation reflected on the Corporation books of account exceeds the amount of a reserve calculated on a straight-line basis.

(d)  Securities, if any, owned by the Corporation which are traded in established over-the-counter channels shall be valued at the mean between the high and the low prices quoted for the securities on such exchange or over-the-counter channels on the applicable date, or if this was not a trading day, then on the last day

10

SCOTT v. C&T 560

immediately preceding the applicable date on which the securities were traded.

(e)    If the Book Value of the Corporation is to be determined prior to the payment for the current fiscal year of salaries, bonuses or contributions to a pension plan of the Corporation which are paid or established on an annual basis, the liabilities of the Corporation shall include an accrual of the appropriate portions of any such salaries or bonuses (including applicable payroll taxes payable in connection therewith) or pension contributions. Such accruals shall be determined by the accountant in an equitable manner from the best information available.

(f)    In determining the liabilities of the Corporation, the accountant shall include an amount for any accrued, but unpaid, liability of the Corporation, including an amount for accrued, but unpaid, federal or state income taxes on the taxable income for that portion of the fiscal year of the Corporation ending on the applicable date, hereinafter referred to as "the short period". Such accrual for income taxes to be made as of the date on which the last Agreed Value was determined shall be made on the basis of the actual income taxes paid for the applicable fiscal year. Such accrual for

11

SCOTT v. C&T 561

income taxes to be made as of the Valuation Date shall be made in accordance with the procedures set forth below:

(i)     The taxable income for the short period shall be placed on an annual basis by multiplying such income by twelve and dividing the result by the number of months in the short period.

(ii)     The taxable income for the twelve-month period shall be computed under the same provisions of law as are applicable to the short period and shall be computed as if the twelve-month period were an actual annual accounting period of the Corporation.  The federal and state income tax shall then be computed on the annualized taxable income at the then applicable rates.

(iii)     The aforesaid accrued liability for federal and state income taxes shall be the same proportion of each respective tax computed on the annual basis as the number of months in the short period is of twelve (12) months, reduced by any payments previously made on account of such tax or estimates thereof.

12

(g)    The    accountant   shall   accrue   such   other liabilities of the Corporation as the accountant, in the accountant's sole judgment, determines to be necessary to avoid a material distortion in the Book Value of the Corporation.

5.5    Lower Price Offered by Proposed Transferee.   In the case of a purchase resulting from an option upon voluntary transfer, if the price, if any, offered by the proposed transferee is less than the purchase price determined in accordance herewith, that price, rather than the price so determined, shall be the price of Shares to be purchased under this Agreement.

ARTICLE VI

PAYMENT OF THE PURCHASE PRICE

6.1    Payment of Purchase Price.    In the event of a sale of Shares to the Corporation during his or her lifetime or resulting from the death of a shareholder, the purchase price for such Shares shall be deferred and payable, together with interest on the unpaid balance from time to time at the Minimum Rate (as defined by Section 6.4), in forty (40) equal quarterly installments of principal and interest, the first installment being due on the ninetieth day following the date of closing of the sale and subsequent installments being due on the same day of each of the succeeding quarters.  Such indebtedness shall be evidenced by the promissory note of the Corporation payable to the order of the

13

SCOTT v. C&T 563

selling party. Such promissory note shall be in substantially the form of that set forth in Exhibit "A" attached hereto.

6.2 Security Interest in Shares. Each promissory note given in connection with the purchase of Shares shall be secured by the purchaser granting to the payee of the note a security interest in the Shares purchased. The purchaser shall execute and deliver to the seller at the closing a Pledge and Security Agreement in the form set forth in Exhibit "B", and such Pledge and Security Agreement shall be the Pledge and Security Agreement to which reference is made in the form of promissory note set forth in Exhibit "A".

6.3 Other Terms. The purchaser and seller of Shares hereunder may by written agreement set such other terms for payment of the purchase price and security therefor as they may determine.

6.4 Minimum Rate. For purposes of this Agreement, the term "Minimum Rate" shall mean the minimum rate of interest which can be used without causing additional interest to be imputed pursuant to the Internal Revenue Code.

ARTICLE VII

THE CLOSING

7.1 Place. Unless otherwise agreed by the parties, the closing of the sale and purchase of Shares shall take place at the principal offices of the Corporation.

7.2 Time. In the case of a purchase of Shares from a deceased shareholder's estate, the closing shall take place no

14

SCOTT v. C&T 564

later than ninety (90) days after the appointment of a personal representative for the deceased shareholder's estate. In the case of a purchase of Shares from a shareholder during his lifetime, the closing of the sale and purchase shall take place no later than thirty (30) days after the selling shareholder has been given written notice by the last of the purchasing party or parties to give such notice of its, his or their exercise of the option or options to purchase the selling shareholder's Shares. In either of the said cases, if any determination by an accountant or an accounting firm is required in connection with the purchase price, the closing shall take place no later than the tenth day after such accountant or firm files with the parties such determination, if such tenth day is later than either of the dates above specified.

7.3    Mechanics.    Upon the closing of the sale and purchase, the selling and purchasing parties shall execute and deliver to each other the various documents which shall be required to carry out their undertakings hereunder including the payment of cash, the execution and delivery of notes and the assignment of stock certificates. The assignment of stock certificates to a purchasing party shall be in the form of an assignment separate from the certificate. The stock certificate shall be physically retained by the selling party as collateral in accordance with the Pledge and Security Agreement for which provision is made in Section 6.2.

Upon the closing, the selling shareholder shall deliver to the

Corporation his resignation and that of his nominees, if any, as officer and director of the Corporation.

7.4 <u>Sale to Remaining Shareholders First.</u> The closing of a sale of Shares to surviving or remaining shareholders shall take place prior to the closing of a sale of Shares by the same seller to the Corporation.

<u>ARTICLE VIII</u>

<u>PLEDGE OF SHARES PROHIBITED</u>

No shareholder shall encumber or use any of his Shares as collateral or security for any loan purpose, except with the written consent of all the parties to this Agreement.

<u>ARTICLE IX</u>

<u>LEGEND ON CERTIFICATES</u>

All Shares now or hereafter owned by the shareholders shall be subject to the provisions of this Agreement and the certificates representing same shall bear the following legend:

"The sale, transfer or encumbrance of this certificate is subject to an agreement dated _____, 1996, between the Corporation and each of its shareholders. A copy of the agreement is on file in the office of the Secretary of the Corporation. The agreement provides, among other things, for certain obligations to sell and to purchase the shares of stock evidenced by this certificate for a designated purchase price. By accepting the shares of stock evidenced by this certificate the holder agrees to be bound by the said agreement."

16

## ARTICLE X

## TERMINATION

10.1    Events of Termination.    This Agreement and all restrictions on the transfer of Shares created hereby shall terminate upon the occurrence of any of the following events:

(a)    The bankruptcy, complete liquidation or dissolution of the Corporation.

(b)    A single shareholder becoming the owner of all of the Shares which are then subject to this Agreement.

(c)    The execution of a written instrument by the Corporation and each of the shareholders which terminates this Agreement.

(d)    The death, within a thirty (30) day period, of two or more of the shareholders who own in the aggregate more than fifty percent (50%) of the Shares, in such case the termination being effective as of the day preceding the date of death of the first shareholder to die, and the Shares shall be owned free of the terms of this Agreement.

10.2    Survival of Rights and Remedies.    The termination of this Agreement for any reason shall not affect any right or remedy existing hereunder prior to the effective date of termination hereof.

17

## ARTICLE XI

### APPLICATION OF AGREEMENT TO AFTER-ACQUIRED SHARES

All of the provisions of this Agreement shall apply to all of the Shares now owned by or which may be issued hereafter to the parties hereto or to others in consequence of any additional issuance, exchange or reclassification of Shares, corporate reorganization or any other form of recapitalization, consolidation or merger, or which are acquired by any of the parties hereto in any other manner.

## ARTICLE XII

### SPECIFIC PERFORMANCE

Inasmuch as the Shares cannot be readily purchased or sold in the open market, irreparable damage would result in the event this Agreement is not specifically enforced. The rights and obligations of purchase and sale hereunder shall be enforceable in a court of equity by a decree of specific performance, and appropriate injunctive relief may be applied for and granted in connection therewith. Such remedy and all other remedies provided for in this Agreement shall, however, be cumulative and not exclusive and shall be available in addition to any other remedies which any party may have under this Agreement or otherwise.

18

SCOTT v. C&T 567

## ARTICLE XIII

### INSUFFICIENT NET ASSETS OF
### THE CORPORATION TO PURCHASE SHARES

In the event the Corporation's net assets shall at any time be insufficient to enable the Corporation legally to make any payments due hereunder under any applicable statute or rule of law with respect to the Shares which it elects, or is required, to purchase under the provisions of this Agreement, the shareholders, for themselves and their respective executors or administrators, jointly and severally agree that they will either cause such action to be taken with respect to the financial structure of the Corporation which will enable it legally to make such purchase; provided, however, if such action is not feasible, they shall not be required to contribute to the Corporation sufficient capital or surplus to enable the Corporation legally to make any such payments hereunder. Solely for the purpose of enabling such change in the financial structure of the Corporation to be effected, the shareholders hereby, for themselves and their respective executors or administrators, agree:

(a) to vote all the Shares standing in their names respectively on the books of the Corporation in favor of such corporate action as shall be necessary to effect the foregoing provisions; and

19

(b)   to execute and deliver any and all documents required to be executed and delivered to effect the foregoing provisions.

## ARTICLE XIV

### AGREEMENT BY CORPORATION

The Corporation hereby agrees that it will not at any time permit any transfer of any stock certificate for Shares to be made on its books or records unless such transfer is made pursuant to and is in accordance with the terms and conditions of this Agreement.

## ARTICLE XV

### GENERAL

15.1   Notices.   All notices for which provision is made in this Agreement shall be given in writing either by actual delivery of the notice into the hands of the party entitled to the notice or by mailing the notice by registered or certified mail, return receipt requested, in which case the notice shall be deemed to be given on the date of its mailing.   If a notice is so mailed it shall be addressed as follows:

(a)   If to the Corporation, to its then principal office.

(b)   If to a shareholder, to the shareholder's then last known principal residence address.

Any party hereto may change the address to which each such notice shall be so mailed by giving written notice to all of the other

20

SCOTT v. C&T 560

parties hereto of such new address. Each of the parties hereto shall be furnished with copies of all notices addressed to any of the other parties hereto.

15.2 **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the Corporation, its successors and assigns, and the respective shareholders and their respective heirs, personal representatives and assigns; and the shareholders by the signing hereof direct their personal representatives to open their estates promptly in a court of proper jurisdiction and to execute, procure and deliver all documents, including but not limited to, appropriate court orders and estate and inheritance tax waivers, as shall be required to effectuate the purposes of this Agreement.

15.3 **Complete Understanding.** This Agreement constitutes the complete understanding among the parties hereto and no alteration or modification of any of the provisions hereof shall be valid unless made in writing and signed by all of the parties hereto.

15.4 **Applicable Law.** This Agreement shall be subject to and governed by the law of the State of Illinois, irrespective of the fact that one or more of the parties now is or may become a resident of a different state.

15.5 **Descriptive Headings.** All section headings, titles and subtitles contained herein are inserted for convenience of reference only and are to be ignored in any construction of the provisions hereof.

21

SCOTT v. C&T 570

22

SCOTT v. C&T 571

The Corporation and the shareholders have executed this Agreement on the date first above written.

MILRUTH CORP.

By: _Milton S. Kiver_ (signature)
    MILTON S. KIVER, President

ATTEST:

_Ruth A. Kiver_ (signature)
Secretary

The Shareholders:

_Milton S. Kiver_ (signature)
Milton S. Kiver

_Ruth A. Kiver_ (signature)
Ruth A. Kiver

_Maureen K. Scott_ (signature)
Maureen K. Scott

_____
Dianne K. Shah

_____
Michael Blum, M.D.

A:\KIVER.SPA

23

The Corporation and the shareholders have executed this Agreement on the date first above written.

MILRUTH CORP.

BY: _[signature]_ MILTON S. KIVER, President

ATTEST:

_[signature]_
Secretary

The Shareholders:

_[signature]_
Milton S. Kiver

_[signature]_
Ruth A. Kiver

_[signature]_
Maureen K. Scott

_[signature]_
Dianne K. Shah

_[signature]_
Michael Blum, M.D.

A:\KIVER.SPA

23

The Corporation and the shareholders have executed this Agreement on the date first above written.

MILRUTH CORP.

By: _Milton S. Kiver_____
    MILTON S. KIVER, President

ATTEST:

_Ruth A. Kiver_____
Secretary

A:\KIVER.SPA

The Shareholders:

_Milton S. Kiver_____
Milton S. Kiver

_Ruth A. Kiver_____
Ruth A. Kiver

_Maureen K. Scott_____
Maureen K. Scott

_Diane K. Shah_____
Diane K. Shah

_____
Michael Blum, M.D.

EXHIBIT "A"

INSTALLMENT PROMISSORY NOTE

_____ (insert closing date)
_____, 19 ____

FOR VALUE RECEIVED, on or before _____ (insert final installment date) the undersigned promises to pay to the order of _____ (insert name of selling party) the principal sum of _____
($ _____) (insert amount of deferred portion of the purchase price), together with interest from the date hereof at the rate of _____ percent ( ____ %) per annum on the principal balance from time to time unpaid. The said principal and interest shall be payable in installments as hereinafter provided.

(a) Commencing on _____, 19 ____ (insert date 90 days following closing or other agreed upon payment date), and on the _____ day of each quarter thereafter for consecutive quarter to and including _____ 19 ____, the sum of ($ _____) shall be payable, said sum to be applied first to accrued and unpaid interest and thereafter to principal.

(b) The entire unpaid balance of principal together with accrued and unpaid interest thereon shall be payable on _____, 19 ____ (insert the month following the last quarterly installment under (a)).

At the option of the undersigned, at any time or times during the term of this Note, all or any portion of the unpaid principal sum and accrued interest on this Note may be prepaid without premium or penalty, the amount of the prepayment to be applied first to accrued interest and the remainder to the unpaid principal. If the undersigned so designates in a written prepayment notice delivered to the holder of this Note concurrently with the making of the prepayment, the amount of the monthly installments shall be reduced by recomputing the monthly installment amount required to amortize the remaining principal balance together with interest as aforesaid over the period remaining to the original maturity date. If no such prepayment notice is so delivered, the same installment amounts stated above shall continue to be payable on the dates designated until such time as the entire principal sum, together with all accrued interest, is paid, at which time this Note shall be paid in full. In such case, the portion of each of the installment amounts

24

attributable to principal shall be recomputed in order to adjust for the decreased interest payable on the reduced unpaid principal balance.

The payment of this Note is secured by a certain Pledge and Security Agreement, bearing even date herewith, to the payee hereof, as the secured party.

At the election of the holder or holders hereof, upon notice to the maker, the principal sum remaining unpaid hereon, together with accrued and unpaid interest thereon, shall become at once due and payable in the event of a default in the payment of any principal or interest when due in accordance with the terms hereof or in the event that at any time hereafter the right of the secured party to enforce his security interest under the Pledge and Security Agreement shall accrue to the legal holder or holders hereof.

The maker hereby waives presentment for payment, notice of dishonor, protest and notice of protest.

_____

(Signature of Purchasing Party)

25

**SCOTT v. C&T 576**

## EXHIBIT "B"

## PLEDGE AND SECURITY AGREEMENT

_____, Illinois

_____, 19_____

TO:

For Value Received, the undersigned hereby grants to you (hereinafter, together with your heirs, successors and assigns, called the "Secured Party") a security interest in _____ shares of Common Stock of _____, together with all rights related thereto (hereinafter collectively called the "Collateral").

The Collateral shall secure a certain Installment Promissory Note payable to you dated _____, 19_____, executed by the undersigned, and all renewals or extensions thereof.

This Agreement has been delivered at _____, Illinois, and shall, unless otherwise required by law, be construed in accordance with and governed by the provisions of the Uniform Commercial Code as in effect from time to time in the State of Illinois.

In the event of a default by the undersigned under the Installment Promissory Note which is not cured within the time period provided therein, the secured party shall be entitled to exercise all rights of a secured party under the Uniform Commercial Code with respect to the Collateral.

26

SCOTT v. C&T 577

The undersigned further agrees that this Agreement shall be binding upon the heirs, legal representatives, successors or assigns of the undersigned.

_____

27

SCOTT v. C&T 578

EXHIBIT "C"

CERTIFICATE OF VALUE

We, the undersigned shareholders of _____ do hereby certify that, for the purposes of the Stock Purchase Agreement dated _____, 19___, the value of each share of common stock as of the date hereof is _____ Dollars ($_____).

Dated this _____ day of _____, 19____.

_____

_____

_____

28



# CHUHAK & TECSON, P.C.

**Attorneys at Law**

30 S. Wacker Drive, Suite 2600
Chicago, Illinois 60606-7413

312.444.9300
Fax 312.444.9027

www.chuhak.com

Writer's Direct Line

(312) 855-4319

Writer's E-mail

DSHINER@CHUHAK.COM

Thomas S. Chuhak
(1920 - 1995)

John P. Adams
David S. Argentar
Jeralyn H. Baran
Fred C. Begy, III
Thomas F. Bennington, Jr.
Mark E. Broaddus
William F. DeYoung
John P. Fadden
Barry A. Feinberg
Mitchell S. Feinberg
Dennis A. Ferraro
Cary S. Fleischer
Valerie J. Freireich
Daniel J. Fumagalli
James B. Gottlieb
Joshua S. Hyman

Terrell J. Isselhard
Edwin L. Josephson
Arnold E. Karolewski
Loretto M. Kennedy
Jeanne M. Kerkstra
Stephen M. Margolin
Alan B. Ronson
Lisa A. Rothstein
Donald J. Russ, Jr.
Steven M. Scholl
David B. Shiner
Mark A. Stang
Gary J. Stern
Andrew P. Tecson
David J. Tecson
Mitchell D. Weinstein
Bari D. Wood
Joseph A. Zarlengo

Sara L. Araszewicz
Dimitra A. Anderson
Kristin G. Bagull
Stacey C. Bromberg
Edmond M. Burke
Cam A. Conlon
Rudy A. Figueroa, Jr.
Phyllis K. Franklin
Michael J. Gilmartin
Lindsay M. Goodman
Lindsay P. Markus
Jill McNamara
Harvey Shifrin
Sanjay Shivpuri
Adrian Smith
Molly Ward
Anne M. Wohlakowski
Kendall E. Woods

Of Counsel
Albert L. Grasso
Joseph A. Tecson
Lawrence E. Glick
Joseph O. Rubinelli
Edward C. Richard

February 27, 2007

**PERSONAL AND CONFIDENTIAL**

Mrs. Ruth Ann River
4320 East Keim Drive
Paradise Valley, Arizona 85253

Re:   **Estate planning**

Dear Ruth:

Enclosed is a memorandum summarizing our meeting with Shelly Silverman where we discussed strategies for Diane to repay her note to you, for Maureen to be treated equal with her sister and strategies to reduce your exposure to estate taxes. Once we receive your approval we will work to implement the strategies.

Please review the memorandum and contact me or Steve to discuss.

Very truly yours,

David B. Shiner

DBS:jeh
Enclosures

cc:   Stephen M. Margolin
      Sheldon A. Silverman (w/encl.)
      Diane Shah (w/encl.)
      Maureen Scott (w/encl.)



# MEMORANDUM

**CHUHAK & TECSON, P.C.**
*Attorneys at Law*

30 S. Wacker Drive
Suite 2600
Chicago, Illinois 60606
Telephone: (312) 444-9300
Facsimile: (312) 444-9027

**TO:** Stephen M. Margolin
Sheldon A. Silverman

**FROM:** David B. Shiner

**DATE:** February 27, 2007

**SUBJECT:** Kiver

On February 20, 2007, Steve, Shelly and I met and discussed the following:

1. Ruth has transferred her 50% interest in 4320 E. Keim Drive, Paradise Valley, AZ 85253 to the Ruth A. Kiver Qualified Personal Residence Trust as of January 2, 2007.

2. The real estate was appraised at $2,750,000 by broker Fred B. Shapiro on February 28, 2006. Ruth's 50% interest, less a fractional share discount of 15% equals $1,168,750. See the attached schedule.

3. The January 2007 AFR is 5.6%. Ruth was born October 8, 1922 and thus her nearest age is 84. The QPRT term is 6 years. Thus the QPRT will be a gift of $411,938. A 2007 gift tax return due April 15, 2008 will be required to report the gift.

4. The Kiver Family Limited Partnership has about $1.9 million in assets. The partnership is owned 1% by Milruth, Inc., 49.5% by the Milton S. Kiver Grantor Trust and 49.5% by the Ruth A. Kiver Grantor Trust. Article VI of the Milton S. Kiver Grantor Trust provides that on Milton's death the trust estate is to be divided into separate equal trusts for each Diane and Maureen. Article IV of the Ruth A. Kiver Grantor Trust provides that during Ruth's life distributions can be made to the Grantor's descendants.

5. The Milton S. Kiver Non GST Exempt Family Trust was funded with $153,133. The Milton S. Kiver GST Family Exempt Trust was funded with $432,408. Each of Diane and Maureen are beneficiaries of the Family Trust.

6. Maureen or her husband owe $475,000 to either Milton or Ruth Kiver.

7. On August 31, 2006, the Milton S. Kiver Marital Trust loaned $2,790,808 to Diane K. Shah at 5.36%. This can be paid off as follows:

   a. Sale proceeds from Diane's condo (this portion of the loan will continue until the condo is actually sold) - 900,000

Memorandum
February 27, 2007
Page 2

b.     Kiver Family Limited Partnership - 950,000

c.     Non GST Family Trust - 76,500

d.     GST Exempt Family Trust - 216,000

e.     Diane's Exempt Trust - 400,000

f.     Gift - 248,308

Total value from parents to Diane is $1,490,808.

8.     Maureen Scott will be made equal as follows:

a.     **Kiver Family Limited Partnership - 950,000**

b.     Non GST Family Trust - 76,500

c.     GST Exempt Family Trust - 216,000

d.     Gift - 248,308

e.     Discharge loans - (475,000)

Total value from parents to Maureen is $1,490,808.

9.     Ruth's 2007 taxable gifts will therefore be $908,554 (248,308 (cash gift) + 411,938 (QPRT)) less $24,000 (annual exclusions) or $884,554. Assuming Ruth has already utilized her $1 million exemption, the gifts will generate a gift tax of $383,049.

10.     Ruth should become an Arizona resident to avoid Illinois state estate taxes. Arizona currently has no state estate tax.

11.     To reduce exposure to estate tax we recommend the formation of 3 limited partnerships to be funded with $10 million, $10 million and $15 million respectively. We assume a 25% discount on a limited partnership interest, but this is subject to an appraisal.

12.     Ruth or the marital trust will contribute a 99% interest in the first limited partnership to a 2 year GRAT. Assuming an AFR of 5.8%, the GRAT will make two annuity payments of $4,079,415 for a zero gift GRAT. Assuming the GRAT grows at 5%, after two years the GRAT will distribute $2,662,203 to children. See the attached schedules.

13.     Ruth or the marital trust will contribute a 99% interest in the second limited partnership to a grantor trust for a private annuity. Assuming an AFR of 5.8%, and the transaction is after April 8, 2007 when Ruth's nearest age is 85, Ruth would be paid an annual annuity

Memorandum
February 27, 2007
Page 3

of $1,583,548. If the grantor trust grows at 5%, the grantor trust will run out of money after the eighth payment. Thus this is a viable strategy only if Ruth has a short life expectancy. See the attached schedules.

14.    Alternatively, Ruth or the marital trust will contribute a 99% interest in the second limited partnership to a CLAT. Assuming an AFR of 5.6%, a five year term and a $1,761,150 annuity, the transaction would generate no gift and could transfer $3,031,350 to children. Even if Ruth dies before the end of the five year term, the CLAT should not be included in her estate under §§2036 or 2038. See the attached schedules.

15.    The third limited partnership will simply be in place for valuation discount purposes.

16.    A transfer to a CRT would generate a large charitable deduction. However, Ruth could simply gift to the Kiver Family Foundation and generate a large charitable deduction.

DBS:jeh

6783242\06539\624939

SCOTT v. C&T 163

## QUALIFIED PERSONAL RESIDENCE TRUST (QPRT)
### (ASSUMES RETAINED REVERSION)

| | |
|---|---|
| Interest Rate: | 5.6 % |
| Age: | 84 |
| Term of QPRT: | 6 |
| Value of Residence: | $1,168,750.00 |
| Retained Income Factor: | 0.20969 |
| Retained Reversion: | 0.43785 |
| Total Retained Interest: | 0.64754 |
| Gift Factor: | 0.35246 |
| Total Gift: | $411,938 |

SCOTT v. C&T 164

679601_1.xls; 06396/24939

SCOTT v. C&T 165

**Kiver**
**Estate Tax Strategies**

**GRAT**

Growth 5.00%

| | Beg balance | Interest | Annuity | End balance |
|---|---|---|---|---|
| 1 | 10,000,000 | 500,000 | 4,079,413 | 6,420,587 |
| 2 | 6,420,587 | 321,029 | 4,079,413 | 2,662,203 |

**Private Annuity**

Growth 5.00%

| | Beg balance | Interest | Annuity | End balance |
|---|---|---|---|---|
| 1 | 10,000,000 | 500,000 | 1,583,548 | 8,916,452 |
| 2 | 8,916,452 | 445,823 | 1,583,548 | 7,778,727 |
| 3 | 7,778,727 | 388,936 | 1,583,548 | 6,584,115 |
| 4 | 6,584,115 | 329,206 | 1,583,548 | 5,329,773 |
| 5 | 5,329,773 | 266,489 | 1,583,548 | 4,012,713 |
| 6 | 4,012,713 | 200,636 | 1,583,548 | 2,629,801 |
| 7 | 2,629,801 | 131,490 | 1,583,548 | 1,177,743 |
| 8 | 1,177,743 | 58,887 | 1,583,548 | (346,918) |

**CLAT**

Growth 5.00%

| | Beg balance | Interest | Annuity | End balance |
|---|---|---|---|---|
| 1 | 10,000,000 | 500,000 | 1,761,150 | 8,738,850 |
| 2 | 8,738,850 | 436,943 | 1,761,150 | 7,414,643 |
| 3 | 7,414,643 | 370,732 | 1,761,150 | 6,024,225 |
| 4 | 6,024,225 | 301,211 | 1,761,150 | 4,564,286 |
| 5 | 4,564,286 | 228,214 | 1,761,150 | 3,031,350 |

*Charitable Lead Annuity Trust* [handwritten]

# GRANTOR RETAINED ANNUITY TRUST ("GRAT")

| | |
|---|---|
| Interest Rate: | 5.8 % |
| Age of Grantor: | Not applicable |
| Trust Term: | 2 |
| Transferred to Trust: | $7,500,000.00 |
| Annual Annuity: | $4,079,413.00 |
| Value Annuity taking into Account Trust Exhaustion per Rev. Rul. 77-454? | No |
| Value Annuity taking into Account Mortality (non-Walton GRAT) | No |
| Annuity Growth Rate: | 0 % |
| Assumed Asset Growth Rate: | 5 % |
| Annuity Factor: | 1.8385 |
| Value of Annuity: | $7,500,000.00 |
| Taxable Gift: | $0.00 |
| Value of Assets at End of GRAT Term: | $0.00 |

# PRIVATE ANNUITY

| | |
|---|---|
| Interest Rate: | 5.8 % |
| Age: | 85 |
| Payment Frequency: | Annual |
| Annuity Payable at: | End of Payment Period |
| Value of Property Transferred: | $7,500,000.00 |
| Basis of Property Transferred: | $0.00 |
| Initial Annual Annuity: | $1,583,547.99 |
| Percent Annuity Graduated: | 0 % |
| Years Deferred: | 0 |
| Adjusted Return Multiple: | 6.4 |
| Adjusted Annuity Factor: | 4.7362 |
| Initial Annual Annuity: | $1,583,547.99 |
| Exclusion Ratio: | 74.0 % |
| Initial Ordinary Income Portion | $411,672.99 |
| Initial Capital Gain Portion | $1,171,875.00 |
| Initial Non-Taxable Portion | $0.00 |

# CHARITABLE LEAD ANNUITY TRUST FOR A TERM OF YEARS

| | |
|---|---|
| Interest Rate: | 5.6 % |
| Term of Years: | 5 |
| Contribution to Trust: | $7,500,000.00 |
| Annuity Payout Rate: | 23.48 % |
| Annual Annuity: | $1,761,150.00 |
| Payment Frequency: | Annual |
| Annuity Factor: | 4.2586 |
| Adjustment Factor: | 1 |
| Adjusted Annuity: | 4.2586 |
| Value of Annuity: | $7,500,033.39 |
| Charitable Remainder: | $0.00 |
| Annuity Payable at End of Period | |

SCOTT v. C&T 168